**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| SYNERGIES CORPORATION, | § | |
| NIRAV MODI, INC., FIRESTAR | § | |
| DIAMOND INTERNATIONAL, INC., | § | |
| AVD TRADING, INC. and | § | |
| FIRESTAR GROUP, INC. | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:19-cv-00100 |
| | § | |
| MORRISON FOERSTER, LLP | § | **JURY TRIAL DEMANDED** |

**PLAINTIFFS' ORIGINAL COMPLAINT**

     Plaintiffs Synergies Corporation, Nirav Modi, Inc., Firestar Diamond International, Inc., AVD Trading, Inc. and Firestar Group, Inc. file this Original Complaint against Defendant Morrison Foerster LLP and, in support, would respectfully show the following:

**I.**    **SUMMARY OF THE CASE**

    1.    This case involves egregious overbilling by a major law firm, Morrison Foerster LLP ("MoFo").

    2.    In May 2018, Plaintiffs hired MoFo to assist in winding down the companies. MoFo promised to execute this work efficiently and promptly, and to keep their clients apprised of the work they were doing.   However, MoFo did none of this.   Instead, MoFo made sure to liquidate certain of Plaintiff's assets (at a discount) and have the funds transferred to MoFo's client trust account.  MoFo then expended an exorbitant and excessive amount of time, primarily on matters that had little to do with winding down the entities.   In the course of two months, MoFo had 34 different timekeepers bill 669 hours at a cost of $484,321.39.

    3.    After two months, and only after Plaintiff repeatedly asked for an itemized bill, and an accounting of their funds held in MoFo's trust account, did MoFo provide this.   Plaintiffs

promptly terminated MoFo's services.  After that, MoFo deducted an additional $53,000 from Plaintiff's funds and returned the balance six weeks later.   To date, MoFo has failed to provide any information to justify taking this additional money, despite Plaintiffs' requests.

## II.   PARTIES

4.   Plaintiff, Synergies Corporation is a Delaware corporation, whose principal place of business is located in Austin, Travis County, Texas—in this District and Division.

5.   Plaintiff, Nirav Modi, Inc. is a Delaware corporation, whose principal place of business is located in Austin, Travis County, Texas—in this District and Division.

6.   Plaintiff, Firestar Diamond International, Inc. is a Delaware corporation, whose principal place of business is located in Austin, Travis County, Texas—in this District and Division.

7.   Plaintiff, AVD Trading, Inc. is a Delaware corporation, whose principal place of business is located in Austin, Travis County, Texas—in this District and Division.

8.   Plaintiff, Firestar Group, Inc. is a Delaware corporation, whose principal place of business is located in Austin, Travis County, Texas—in this District and Division.

9.   Defendant, Morrison Foerster LLP ("MoFo") is an international law firm with 16 offices located throughout the United States, Asia, and Europe. The firm has over 1,000 lawyers. Its revenue is for 2017 was $1.06 billion.  MoFo is a California limited liability partnership, with its principal place of business in the State of California.  Although this defendant does and continues to do extensive business in the State of Texas and within this District and Division, it has not designated a registered agent for service in this State.  It may be served with summons and complaint via certified mail to its Firm Chairman, Larren M. Nashelsky, Morrison Foerster,

LLP, 250 West 55th Street, New York, NY 10019-960, and its General Counsel, Douglas Hendricks, Morrison Foerster, LLP, 425 Market Street, San Francisco, CA 94105.

## III.    JURISDICTION AND VENUE

10.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1391, because the Plaintiffs and Defendant are citizens of different states, and Plaintiffs seek damage in excess of $75,000, exclusive of interest and costs.

11.    This Court has personal jurisdiction over Defendant MoFo, because it does extensive business in this District and Division and because the conduct complained of in this Complaint occurred in this District and Division.

12.    Venue is proper in this District and Division, pursuant to 28 U.S.C. §1391(b)(2).

## IV.    FACTS COMMON TO ALL CLAIMS ASSERTED

13.    In early 2018, Plaintiffs' owners decided that they wished to wind down and liquidate each company.   Initially, Plaintiffs retained a different firm to perform this work. However, that firm did not meaningful work.  In May 2018, the companies' owners appointed new management for the companies, which included Rochelle Miller, the CEO, who was at all times based in Austin, Texas.  On May 31, 2018, Plaintiffs retained MoFo as their counsel.   The scope of the representation was to wind down and dissolve the Plaintiffs, liquidate the assets of the Plaintiffs and distribute the proceeds to the owners of the companies.

14.    Plaintiffs and MoFo entered into an engagement agreement to confirm the arrangement.   The MoFo partner who signed the agreement was Jeffrey Bell.   The parties agreed that MoFo would bill for its services on an hourly basis.   Among other things, Mr. Bell affirmed that:

*"As the partner in charge of the engagement, staffing decisions will be made by me with the objective of rendering our services on the <u>most efficient</u> and <u>cost-effective</u> basis."*   (emphasis added)

15.    Further, Mr. Bell represented that:

*"We will keep you apprised of developments as necessary to perform our services and will consult with you as necessary to ensure the timely, <u>effective</u> and <u>efficient</u> completion of our work."*
(emphasis added)

16.    As for MoFo's billing practices, Mr. Bell attached MoFo's "Billing Policies and Procedures" to the engagement agreement.  In that document, MoFo represented that:

*"An important component of our client service commitment is ensuring that the fees we charge our clients are consistent with the value we bring to each project."*

17.    This policy further noted:

*"Our invoices will reflect the reasonable value of our services as determined by the billing attorney, taking into account the time devoted to the matter and any other relevant circumstances not reflected in our normal hourly rates."*

18.    The policy also noted that:

*"Generally, our invoices are prepared and forwarded to our clients monthly covering fees and costs incurred for the prior month."*

19.    As for payment, MoFo required an initial retainer payment from the Plaintiffs. The engagement letter called for a $50,000 retainer, but the parties agreed that Plaintiffs would make two $15,000 retainer payments, which they made.   MoFo advised that they would apply retainer

4

funds (and only these retainer funds) towards their billing, but only after sent the Plaintiffs their bills and Plaintiffs' approved them.  As noted below, this did not happen.

20.     After being retained, MoFo proceeded to assign what finally became 34 different timekeepers to the file.  These timekeepers billed at least 669 hours in a two month period, at a total cost of $477,910.00 in that period.

21.     This should have been a straight-forward assignment.     Experienced lawyers (particularly those who bill at over $1,000/hour as MoFo did) should know that one of the first steps would be to file certificates of dissolution in Delaware.   In fact, this was one of the few items that Plaintiffs charged MoFo with accomplishing.  However, MoFo never did that or anything else to formally wind the companies down.   Another first, and basic, step would be to review the clients' financial statements to assess all assets, claims and debts.   It does not appear that MoFo did that either.  MoFo did not prepare any general ledger or balance sheets for the companies.   Accordingly, MoFo completely missed $27 million in claims that Plaintiffs' could have asserted in a bankruptcy action.  Fortunately, after MoFo was terminated, Plaintiffs' new counsel quickly performed these tasks, identified the claims, and asserted them.

22.     Instead of working on actually winding down the companies, MoFo focused on various small components of the process.   Although these tasks should have been minor parts of the dissolution and liquidation process, MoFo apparently devoted substantial time on these minor, side projects.

23.     A review of the work done makes it clear that MoFo's primary concern was actually liquidating claims (at a major discount) so that Plaintiff's funds could be sent to MoFo's trust account, which could then be used to pay MoFo's exorbitant bills.

24.     Almost immediately after MoFo was retained, MoFo negotiated to sell certain of Plaintiffs' property to a jeweler in Miami, and to have the $260,000.00 proceeds wired to the MoFo's trust account.   MoFo did not consult with the Plaintiffs on this transaction until after it had been agreed to, and has not provided any details on the subject assets or the basis for the sales price. Plaintiffs believe that MoFo agreed to sell this property at a substantially reduced value.

25.     Not long afterward, MoFo negotiated with a landlord in Las Vegas to return certain funds that Plaintiffs had advanced in connection with surety bond to cover construction of a retail store.  The surety bond was valued at $1,362,080.   MoFo negotiated for the return of $700,000 – a discount of $662,080.  However, MoFo did not explain the rationale for this large discount.  MoFo never provided Plaintiffs with any details on the settlement.   But, most importantly to MoFo, the agreement they made called for the immediate payment of the first installment ($350,000) into their trust account at MoFo.

26.     Aside from identifying these two claims and compromising them at a significant discount, MoFo did very little on the actual scope of the project.  For instance, one specific area that Plaintiffs specifically asked MoFo to address was to obtain directors' and officers' liability insurance for Plaintiff's officers.  Although MoFo billed the Plaintiffs to "assess" this project, they advised that such coverage was not necessary, and did not obtain this.  Plaintiffs finally procured this coverage on their own.

27.     Another matter that Plaintiffs specifically asked MoFo to address was the recovery of its property from a third party security firm.  However, despite purportedly billing many hours on this project, MoFo was not able to recover this property.  Plaintiffs were quickly able to do so after MoFo was terminated.

28.     Another matter that MoFo spent extensive time addressing was a lawsuit filed against one of the Plaintiffs by Israel Discount Bank   After spending hours assessing the lawsuit, MoFo recommended that this Plaintiff be placed into Chapter 7 bankruptcy.  MoFo made no effort to negotiate the claim.   Plaintiffs turned to another firm to handle the matter.  That firm quickly determined that the lawsuit had no merit, made one phone call to the opposing lawyer to explain the situation, and the opposing lawyer promptly dismissed the suit.

29.     MoFo also continually pushed Plaintiffs to retain a separate consulting firm to effectively replace Plaintiff's executive management team.   Plaintiffs refused.  Not deterred, MoFo attempted to sneak in a provision to a corporate resolution to appoint this firm in this capacity.   The CEO, Ms. Miller, noted this unauthorized provision and deleted it.

30.     Despite holding itself out as being skilled in these types of matters, MoFo billed the Plaintiffs for an inordinate and unreasonable amount of time to draft simple, one-page corporate resolutions and to "research" the most basic corporate issues.

31.     Another matter that MoFo spent extensive time addressing was responding to a subpoena in a bankruptcy matter.  MoFo provided little in updates to the clients as to what they were doing. Instead, MoFo procured all of Plaintiff's records and apparently elected to review all of them.  It does not appear that MoFo made any attempt to consult with the lawyer issuing the subpoena to seek to narrow the scope.  If MoFo did so, it did not apprise its clients of this, or any of their options on how to address the subpoena.  Instead, MoFo apparently spent hours reviewing documents and then producing them to the opposing party.  Incredibly, MoFo did not provide Plaintiffs with the subpoena response or the documents that it produced, to the clients, until long after they had been discharged.

32.     Although MoFo billed the clients for this extensive document review, this review either did not happen or was done far below the standard of care.  Notably, a review of the production reflects that MoFo produced:

- Completely non-responsive documents, such as receipts from a sandwich shop, personal photographs, blank forms and even a winning lottery ticket claim form.

- Numerous documents that contained un-redacted personally identifiable information and banking information.  **MoFo even produced a copy of Ms. Miller's passport (three separate times) with no redactions**.

- Personal Emails.

33.     MoFo claims to have spent many hours dealing with one of the Plaintiff's landlords in Honolulu and one in New York, but did not advise the clients of any such dealings. Plaintiffs believe that MoFo actually did no work on these matters.   It does not appear that MoFo accomplished anything on this work.

34.     MoFo claims to have spent many hours working on "tax extensions" and "responding to IRS tax inquiries", but did not advise the clients of any such dealings, or why lawyers would be handling such matters.

35.     MoFo purported to spend many hours, and thousands of dollars in fees, dealing with a storage facility to recover Plaintiff's items at that facility.  The value of the items was less than $5,000.00.   However, MoFo was not able to accomplish this simple task.  After MoFo was fired, Ms. Miller was able to accomplish this with a few phone calls.

36.     Another basic task that MoFo mishandled involved two bank accounts that Plaintiffs held at two major banks.  MoFo advised that these banks would not give Plaintiffs access to the accounts, and that MoFo would need to file lawsuits against the banks, in order to obtain access.  Obviously, this would have resulted in thousands of dollars of fees to MoFo.  After Plaintiffs terminated MoFo, Plaintiffs' new counsel was able to quickly obtain the

banks' agreement to provide access to the accounts.

37.    MoFo purported to devote several hours on an insurance claim for inventory that had been stolen from one of the Plaintiff's locations in Las Vegas.  However, it does not appear that MoFo did anything on this matter.   MoFo provided no information to Plaintiff on exactly what they allege to have done, and certainly made no progress on this.

38.    In late July 2018, Plaintiffs became concerned about the "services" that MoFo was providing, and was not providing.  At that point, MoFo had been working for two months but had not sent a bill or an accounting of any of Plaintiff's funds held in MoFo's trust accounts. Plaintiffs asked MoFo to provide current bills and an accounting.  On August 3, 2018, MoFo finally provided a billing statement and a summary of the amounts received in the trust account. The billing reflected grossly excessive billing, which totaled 669 hours at $484,321.39 – for two months of work.   The statement also reflected that Plaintiffs had paid $30,000 in retainer payments, and that MoFo had arranged for $625,319.00 to be sent into MoFo's trust account, for a total of $655,319.00.

39.    The statement also reflected that MoFo had unilaterally decided to pay itself from these funds – although this was never authorized.  This left $170,997.61 in the trust account.

40.    The billing statement makes clear that the "work" that MoFo alleges to have performed did not appreciably further the interests of the Plaintiffs.  The statement confirms that the amount of time that MoFo alleges to have spent on these tasks and the amount billed were either wholly unnecessary, duplicative, non-billable activities, and were grossly excessive and violated applicable rules of professional conduct.  Further, in many instances, MoFo's billing reflects billing in a manner where a group of tasks were combined into one entry without delineation of the amount actually spent for each task.  This practice renders it impossible to

9

determine exactly what tasks were performed and the amount of time allegedly spent for such tasks.  Further, MoFo routinely billed for duplicative assignments, inter-office conferences, emails among staff, each of whom appear to have billed for the same tasks.  In sum, this was a billing feeding frenzy.

41.     Further, given the grossly excessive and fraudulent billing charged to Plaintiffs, it is clear that MoFo had no system of checks and balances by senior management to avoid such billing improprieties.  If there were any such systems or review, they were clearly ineffective.

42.     After receiving this statement, Plaintiffs immediately instructed MoFo to stop all work and set a conference call shortly thereafter, where Plaintiffs confirmed this to MoFo.

43.     Plaintiffs also promptly asked that MoFo immediately return all of the remaining monies in the trust account.

44.     It was not until September 19, 2018, that MoFo finally returned $117,304.95 of their funds to Plaintiffs.  To date, and despite numerous requests, MoFo has never provided an accounting for this additional $53,000 that MoFo took from the Plaintiffs.

45.     Plaintiffs retained other counsel whose services cost Plaintiffs several hundred thousand dollars to perform the work that MoFo had purported to do for Plaintiffs, and to remedy MoFo's many errors.

## V.     <u>CAUSE OF ACTION 1:  BREACH OF FIDUCIARY DUTY</u>

46.     Plaintiffs repeat the allegations of the preceding paragraphs as if fully set forth herein.

47.     At all relevant times, Plaintiff were clients of MoFo.  The relationship between an attorney and client is a fiduciary relation of the highest character and the attorney owes a duty of undivided loyalty to the client.  MoFo owed Plaintiffs fiduciary duties of honesty, loyalty, good

faith, care and candor to Plaintiffs, and to act in Plaintiffs' interest at all times.  Plaintiffs placed

their trust in MoFo.

48.     MoFo breached its duties to Plaintiffs in multiple ways, including, but not limited to:

     a.     Placing its own interests above Plaintiffs;

     b.     Failing to adequately supervise personnel providing services to Plaintiffs;

     c.     Failing to ensure that the services provided to Plaintiffs were reasonable and

necessary and advanced the interests of Plaintiffs;

     d.     Billing Plaintiffs for tasks that that were unnecessary, duplicative, non-

billable and excessive;

     e.     Paying itself from Plaintiffs' funds held in trust, without Plaintiffs' approval;

and

     f.     Paying itself from Plaintiffs' trust funds without providing any explanation,

and without Plaintiffs' approval.

49.     As a result of MoFo's breaches, Plaintiffs have been damaged, as set forth below.

50.     Plaintiffs seek both compensatory and punitive damages for these fiduciary duty

breaches.

## VI.     CAUSE OF ACTION 2:  NEGLIGENCE

51.     Plaintiffs repeat the allegations of the preceding paragraphs as if fully set forth

herein.

52.     MoFo owed Plaintiffs a duty to adequately and properly represent Plaintiffs'

interests and to meet the standard of care for attorneys providing services to their clients.

53.     MoFo breached these duties and fell below the standard of care in the following

ways:

a.      Placing its own interests above Plaintiffs;

b.      Failing to adequately supervise personnel providing services to Plaintiffs;

c.      Failing to ensure that the services provided to Plaintiffs were reasonable and necessary and advanced the interests of Plaintiffs;

d.      Billing Plaintiffs for tasks that that were unnecessary, duplicative, non-billable and excessive;

e.      Paying itself from Plaintiffs' funds held in trust, without Plaintiffs' approval; and

f.      Paying itself from Plaintiffs' trust funds without providing any explanation, and without Plaintiffs' approval.

54.     As a direct and proximate result of MoFo's negligence, Plaintiffs have suffered damages as set out below.

## VII.   CAUSE OF ACTION 3: FRAUD

55.     Plaintiffs repeat the allegations of the preceding paragraphs as if fully set forth herein.

56.     MoFo made false statements of material fact to Plaintiffs, including but not limited to:

a.      Representing that its services would be provided on the most efficient and cost-effective basis;

b.      Representing that payment for its services would come only from actual retainer payments made by the Plaintiffs;

c.      Representing that MoFo would keep Plaintiffs apprised of developments as necessary to perform MoFo's services to Plaintiffs;

d.      Representing that MoFo would consult with Plaintiffs to ensure the timely, effective and efficient completion of its work;

e.      Representing that MoFo would provide invoices on a monthly basis;

f.      Representing that the services for which it billed Plaintiffs and as represented on the invoice were actually provided;

g.      Representing that the services for which it billed Plaintiffs and as represented on the invoice were actually provided; and

h.      Representing that the services for which it billed Plaintiffs and as represented on the invoice were provided in furtherance of Plaintiffs' interests.

57.     As set forth above, those representations were false and MoFo knew they were false when made.  MoFo made these statements to induce Plaintiffs to retain MoFo.   Plaintiffs actually relied on these false statements, to their detriment and retained MoFo.  As a result, Plaintiffs suffered damages, as set out below.  Plaintiffs seek compensatory and punitive damages for MoFo's fraud.

## VIII.   <u>CAUSE OF ACTION 4: BREACH OF CONTRACT</u>

58.     Plaintiffs repeat the allegations of the preceding paragraphs as if fully set forth herein.

59.     Plaintiffs and MoFo entered into an agreement on or about May 30, 2018, whereby MoFo agreed to provide legal services to Plaintiffs.

60.     Among other things, MoFo agreed to:

a.      Provide services in an efficient and cost-effective basis;

b.      Keep Plaintiffs apprised of the progress of their work;

c.      Consult with Plaintiffs to ensure timely, effective and efficient completion

of its work;

        d.      Provide Plaintiffs with invoices on a monthly basis;

        e.      Bill Plaintiffs for work actually done;

        f.      Deduct any charges only from retainer funds tendered by Plaintiffs; and

g.      Provide an accounting of any amounts deducted from Plaintiffs' trust funds.

61.      MoFo breached these agreements by:

        a.      Placing its own interests above Plaintiffs;

        b.      Failing to adequately supervise personnel providing services to Plaintiffs;

        c.      Failing to ensure that the services provided to Plaintiffs were reasonable and necessary and advanced the interests of Plaintiffs;

        d.      Billing Plaintiffs for tasks that that were unnecessary, duplicative, non-billable and excessive;

        e.      Paying itself from Plaintiffs' funds held in trust, without Plaintiffs' approval; and

        f.      Paying itself from Plaintiffs' trust funds without providing any explanation, and without Plaintiffs' approval.

62.      As a result of MoFo's breaches, Plaintiffs suffered damages, as set out below. Plaintiffs seek compensatory damages and attorneys' fees.

## IX.    CAUSE OF ACTION 5: THEFT

63.      Plaintiffs repeat the allegations of the preceding paragraphs as if fully set forth herein.

64.     As set forth above, Plaintiff provided $30,000 in retainer payments to be held in MoFo's trust account, for payment towards future work.   MoFo also arranged for $625,319.00 of Plaintiff's funds to be sent into MoFo's trust account.

65.     Without receiving Plaintiffs' approval, MoFo paid itself $484,321.39 and later $53,692.66 (totaling $538,014.05) from Plaintiff's funds held in MoFo's trust account.

66.     MoFo has never provided an accounting of the $53,692.66 that it took from MoFo's trust account, after Plaintiffs' terminated MoFo.

67.     Thus, MoFo unlawfully misappropriated Plaintiffs' property.   As a result of MoFo's theft, Plaintiffs suffered damages, as set out below.

## X.     DAMAGES

68.     As set forth above, as a result of MoFo's acts and omissions, Plaintiffs have suffered actual damages, including over $500,000 in monies that MoFo paid itself from Plaintiffs' funds without authorization, loss of value of certain assets that were sold at a discount (estimated to exceed $1 million), and costs associated with retaining new counsel to address MoFo's many mistakes.    Plaintiffs seek judgment for compensatory damages, interest, attorneys' fees, punitive damages, and disgorgement of fees.

## XI.    JURY DEMAND

69.     Plaintiffs respectfully request a trial by jury.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment against Defendant Morrison Foerster LLP, for actual damages, punitive damages, attorneys' fees, pre-and post-judgment interest, all costs of court, and all such other and further relief, at law and in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

**THE BUZBEE LAW FIRM**


By:   */s/ Anthony G. Buzbee*
      Anthony G. Buzbee, *pro hac vice to be sought*
      State Bar No. 24001820
      tbuzbee@txattorneys.com
      Peter K. Taaffe
      State Bar No. 24003029
      ptaaffe@txattorneys.com
      JP Morgan Chase Tower
      600 Travis, Ste 7300
      Houston, Texas 77002
      Tel.: 713.223.5393
      Fax: 713.223.5909

**ATTORNEYS FOR PLAINTIFFS**